# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued November 8, 2007        Decided June 20, 2008

No. 07-7037

FC INVESTMENT GROUP LC AND
LAWRENCE JAY EISENBERG,
APPELLANTS

v.

IFX MARKETS, LTD.,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 04cv01939)

*Alan B. Sternstein* argued the cause for the appellant. *Courtney R. Sydnor* and *Gregory D. Grant* entered appearances.

*Kevin J. Clancy* argued the cause for the appellee. *Joan M. Kubalanza* was on brief. *Kenneth S. Nankin* entered an appearance.

Before: HENDERSON and TATEL, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: FC Investment Group LC (FCIG) and Lawrence Jay Eisenberg (Eisenberg) sued IFX Markets, Ltd. (IFX), a London-based

currency broker, alleging that IFX conspired with Titan Global Strategies, Ltd. (Titan), a now-defunct investment company, to defraud them of millions of dollars through a currency investment scheme.[1] The district court denied their motion for jurisdictional discovery and ultimately dismissed their four-count complaint for lack of personal jurisdiction. *FC Inv. Group LC v. IFX Markets, Ltd.*, 479 F. Supp. 2d 30, 44 (D.D.C. 2007). For the reasons set forth below, we affirm the district court.

## I.

FCIG, a Maryland limited liability company owned and managed by Eisenberg and with its principal place of business in the District of Columbia (District), and Eisenberg, a Maryland resident, allege that they lost several million dollars[2] in a fraudulent investment scheme brokered by IFX and run by Titan. Am. Compl. ¶¶ 1–2, 6. The plaintiffs' involvement with IFX and Titan began in September 1998 when "Titan and its officials," *via* unspecified means, "contacted Eisenberg at his offices in the District of Columbia about making an investment in a foreign currency trading account to be managed by Titan." *Id*. ¶ 7. Titan informed Eisenberg that its currency trades were made by IG Group, PLC (IG), a currency trader. *Id.* Eisenberg was also told that his investment was "completely liquid" and could be withdrawn at any time with notice to Titan. *Id*. ¶ 8. Eisenberg subsequently received by mail an informational

---

[1]Although Titan is not a defendant in this lawsuit, FCIG has obtained a $6.5 million judgment against Titan and its owner, Milan Martinic, in separate litigation. *See FC Inv. Group LC v. Titan Global Strategies, LTD*, No. 2004cv0312 (Wis. Cir. Ct. July 20, 2004).

[2]The precise amount the plaintiffs allege they lost due to Titan's and IFX's fraud is unclear. *Compare* Am. Comp. ¶ 6 (alleging $ 9.5 million in losses) *with* Am. Comp. ¶¶ 9, 12 (alleging total investment of approximately $1 million by Eisenberg and $5 million by FCIG).

brochure describing Titan's relationship with IG. *Id.* Eisenberg made an initial investment of $10,000. *Id.* Between October 1998 and October 2003, Eisenberg continued to invest with Titan, eventually investing approximately $1 million. *Id.* ¶ 9. Eisenberg's wife invested an additional $400,000. *Id.* In April 2001, Eisenberg formed FCIG to "introduc[e] certain friends and family-member investors to Titan." *Id*. ¶ 1. By October 2003, FCIG had invested approximately $5 million with Titan. *Id*. ¶ 12. Through at least 2003, Titan continued to send "account statements" to both Eisenberg and FCIG in the District indicating "large earnings on FCIG's investments." *Id*. ¶ 13.

Also in early 2001, Charles Knott, a Titan employee, became Titan's "investment advisor and point-of-contact" for FCIG. *Id*. ¶ 14. Knott met with Eisenberg "several times" in the District between 2001 and 2002 to update Eisenberg on Titan's operations. *Id*. Sometime in 2002 Knott advised the plaintiffs that IFX was replacing IG as Titan's currency broker. *Id*. ¶ 15. The plaintiffs allege that IFX knew, when it replaced IG, that "it was entering into [a] fraudulent foreign currency exchange scheme." *Id.* Thereafter, Christopher Cruden of IFX's Managed Investment Products Department telephoned Eisenberg regularly to provide updates on IFX's activities and to invite Eisenberg to visit IFX's London office. *Id.* ¶ 15. Eisenberg visited the London office in November 2002. *See id*. ¶ 18. During his trip, Eisenberg met with Knott (as noted, a Titan employee) as well as with Cruden and other IFX officers. *Id*. ¶ 21. While there, Eisenberg was shown an "elaborate" PowerPoint presentation, created jointly by IFX and Titan employees, which described Titan's and IFX's business relationship. *Id*. ¶¶ 19–21. Following Eisenberg's London trip, FCIG and "investors associated with FCIG" invested an additional $2 million with Titan. *Id*. ¶ 23.

In late 2003, Eisenberg asked Titan to close his account and refund the balance of his investment but Titan rebuffed him. *Id*.

¶ 25. When FCIG demanded return of its funds, Larry Lichtenstein and Milan Martinic, two members of Titan's board of directors, assured FCIG that "Titan had deposited $4.3 million in an account at US Bank" and that those funds were available to repay FCIG. *Id.* ¶ 26. On January 4, 2004, Lichtenstein sent Eisenberg a copy of a $4.3 million deposit slip falsely showing that Titan had deposited the funds in the bank. *Id.* Neither Eisenberg's nor FCIG's investments have been returned.[3] *Id*. ¶ 25.

In November 2004, Eisenberg and FCIG filed suit against IFX in district court. Their amended complaint contained four counts: (1) fraud/fraud in the inducement, *see id.* ¶¶ 33–37; (2) civil conspiracy, *see id.* ¶¶ 38–41; (3) civil aiding and abetting, *see id*. ¶¶ 42–46; and (4) conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961 *et seq.*, *see id*. ¶¶ 47–59.

In February 2005, IFX moved to dismiss the suit for lack of personal jurisdiction. *See* Appellee's Mot. to Dismiss 2 (Feb. 7, 2005). In response, Eisenberg and FCIG asserted four bases for personal jurisdiction: (1) the district court had general personal jurisdiction over IFX based on its maintenance of an interactive website accessible—and used—in the District, Appellants' Mem. in Opp'n to Mot. to Dismiss 7–10 (Aug. 8, 2006); (2) the court had specific personal jurisdiction over IFX based on Cruden's "regular" telephone calls to Eisenberg at Eisenberg's District office, *id.* at 10–11; (3) the court had personal jurisdiction over IFX based on the actions of IFX's co-conspirator, Titan, in the District, *id.* at 11–14; and (4) the court had personal jurisdiction over IFX pursuant to RICO's nation-wide service of process provisions. *Id.* at 16. In February 2006,

---

[3]The $6.5 million judgment FCIG obtained from Titan and Martinic, *see supra* note 1, remains unsatisfied. *See* Appellants' Br. 13.

the district court rejected all four bases and dismissed their amended complaint. *FC Inv. Group*, 479 F. Supp. 2d at 44. It also denied the plaintiffs' request for jurisdictional discovery. Order Denying Mot. 1 (July 7, 2005). Eisenberg and FCIG filed a timely appeal.

## II.

We review *de novo* the district court's dismissal of the amended complaint for lack of personal jurisdiction. *See Gorman v. Ameritrade Holding Corp.*, 293 F.3d 506, 509 (D.C. Cir. 2002) (citing *Second Amendment Found. v. United States Conference of Mayors*, 274 F.3d 521, 523 (D.C. Cir. 2001)). We review its denial of jurisdictional discovery for abuse of discretion. *See Tax Analysts v. IRS*, 410 F.3d 715, 720 (D.C. Cir. 2005) (citing *Stewart v. Evans*, 351 F.3d 1239, 1245 (D.C. Cir. 2003)). The plaintiffs have the burden of establishing the court's personal jurisdiction over IFX. *See Reuber v. United States*, 787 F.2d 599, 599 (D.C. Cir. 1986).

### A. *General Jurisdiction*

#### 1. District's Long-Arm Statute

Eisenberg and FCIG claim that the district court has "general" personal jurisdiction over IFX because IFX maintains a website that allows District residents "to engage in frequent and large value currency, precious metal and other transactions." Appellants' Br. 14.[4] D.C. Code § 13-334(a) "permits courts to exercise 'general jurisdiction' over a foreign corporation as to claims not arising from the corporation's conduct in the

---

[4]They concede that "IFX apparently has no offices" in the District. Appellants' Mem. in Opp'n 7; *see also* Decl. of Steven R. Reeves ¶ 5 (IFX "does not maintain any offices, agents or employees in the District of Columbia.").

District[] if the corporation is 'doing business' in the District."[5] *Gorman*, 293 F.3d at 509 (quoting D.C. Code § 13-334(a); citing *AMAF Int'l Corp. v. Ralston Purina Co.*, 428 A.2d 849, 850 (D.C. 1981)). "Under the Due Process Clause, such general jurisdiction over a foreign corporation is only permissible if the defendant's business contacts with the forum are 'continuous and systematic.'" *Id.* at 510 (quoting *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 415 (1984)). The D.C. Court of Appeals "has indicated that the reach of 'doing business' jurisdiction under § 13-334(a) is co-extensive with the reach of constitutional due process." *Id.* (citing *Hughes v. A.H. Robins Co., Inc.*, 490 A.2d 1140, 1148 (D.C. 1985)).

Under certain circumstances, a foreign corporation's maintenance of a website that is accessible in the District can satisfy general jurisdiction requirements. *See, e.g.*, *id.* at 513. But "[t]he mere accessibility of [a] defendant['s] website[] . . . does not establish the necessary minimum contacts" required for

---

[5]Section 13-334(a) provides:

> In an action against a foreign corporation doing business in the District, process may be served on the agent of the corporation or person conducting its business, or, when he is absent and can not be found, by leaving a copy at the principal place of business in the District, or where there is no such place of business, by leaving a copy at the place of business or residence of the agent in the District, and that service is effectual to bring the corporation before the court.

D.C. Code § 13-334(a). Although section 13-334(a) expressly addresses service of process, the D.C. Court of Appeals has held that section 13-334(a) also grants general personal jurisdiction over "a foreign corporation which carries on a consistent pattern of regular business activity" within the District. *AMAF Int'l Corp. v. Ralston Purina Co.*, 428 A.2d 849, 850 (D.C. 1981); *see also Gorman*, 293 F.3d at 510 n.1; *El-Fadl v. Cent. Bank of Jordan*, 75 F.3d 668, 673 n.7 (D.C. Cir. 1996).

general jurisdiction. *Id.* at 512 (quotations and alterations omitted). Two additional criteria must be met. First, the website must be "interactive." *See id.* at 511. An "'essentially passive' website through which customers merely access information" is insufficient. *Id.* at 512 (quoting *GTE New Media Servs., Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1348 (D.C. Cir. 2000)). Moreover, District residents must use the website in a "'continuous and systematic'" way. *Id.* at 512 (quoting *GTE*, 199 F.3d at 1350); *see id.* at 513 ("[D]etermining whether Ameritrade is actually 'doing business' in the District requires an examination of the frequency and volume of the firm's transactions with District residents."); *see also Atlantigas Corp. v. Nisource, Inc.*, 290 F. Supp. 2d 34, 52 (D.D.C. 2003) ("[T]he question is not whether District of Columbia residents 'can' transact business in the District with the non-resident defendant through the defendant's website, but if they actually 'do' engage in sustained business activities in a continuous and systematic way." (citing *Gorman*, 293 F.3d at 512–13)).

Although the district court found that IFX's website failed to meet both requirements, we focus only on the second requirement.[6] The district court noted that the plaintiffs alleged

---

[6]Regarding the first requirement—an interactive website—the district court held that IFX's website was not sufficiently "active" to support its general jurisdiction over IFX. *See FC Inv. Group*, 479 F. Supp. 2d at 37. It contrasted IFX's website with the website in *Gorman*, 293 F.3d at 512. There we held that a website maintained by Ameritrade, a Nebraska-based securities broker, was sufficiently "interactive" to support general jurisdiction in the District because the website allowed District residents to "[1] open Ameritrade brokerage accounts online; [2] transmit funds to their accounts electronically; . . . [3] use those accounts to buy and sell securities, borrow from Ameritrade on margin, and [] pay Ameritrade brokerage commissions and interest." *Id.* at 512. Although both IFX's and Ameritrade's websites allowed users to conduct financial transactions online, the

"only one District of Columbia resident has ever opened an online account with [IFX], and it was open for just six months in 2003." *FC Inv. Group*, 479 F. Supp. 2d at 37 (citing Mem. in Opp'n 8). Eisenberg and FCIG disagree. They claim it was *IFX*

---

district court found one critical difference between the two: unlike Ameritrade's website, the IFX website did not allow for online account registration. *FC Inv. Group*, 479 F. Supp. 2d at 37. To become an IFX customer, one was required to download an application form, sign it and return it "along with required identification documents . . . certified by an attorney, . . . an embassy authority, consulate or high commission of the country of issue." *Id.* (quotation omitted). Because of this deficiency, the district court determined that the IFX website was not sufficiently active for general jurisdiction. But a foreign defendant that is "doing business" with "continuous and systematic contacts" in the District, via internet, mail or some combination of the two, suffices for general jurisdiction. *Cf. Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 467 (1985) ("[I]t is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by *mail and wire* communications across state lines, thus obviating the need for physical presence within a State in which the business is conducted." (emphasis added)); *Blumenthal v. Drudge*, 992 F. Supp. 44, 56 (D.D.C. 1998) (finding general jurisdiction over foreign defendant based on combination of website and email list). Because IFX made its mail-in registration form readily available for download on its website, the district court's focus on IFX's lack of an *online* registration feature may be misplaced. *See, e.g.*, *Citigroup Inc., v. Citi Holding Co.*, 97 F. Supp. 2d 549, 565 (S.D.N.Y. 2000) (finding jurisdiction based on website's allowing potential customers to, *inter alia*, "print out an application for submission by facsimile"); *Obabueki v. Int'l Bus. Machs. Corp.*, 99cv11262, 2001 WL 921172, at *3 (S.D.N.Y. Aug. 14, 2001) (finding jurisdiction based on website's allowing "prospective customers [to] download an application form which can be faxed to [defendant]"). We do not reach the merits of the district court's holding on this issue, however, because of our holding as to the second requirement.

that asserted that there had been only one District user. *See* Appellants' Brief 18. In their Memorandum in Opposition to Defendant's Motion to Dismiss, Eisenberg and FCIG alleged that IFX had "*at least one*" user in the District. Appellants' Mem. in Opp'n 8 (emphasis added). The district court's error is nonetheless harmless. According to an IFX compliance officer, her search of IFX's records for customers residing in the District with "account[s] opened for use with the IFX online trading system" revealed only one such customer. *See* Walsh Decl. ¶¶ 2, 3, 5. That account was open for approximately six months during the latter half of 2003. *Id.* ¶ 5. The record thus supports the court's conclusion that IFX had only one customer resident in the District.

This limited contact with a single District customer—unrelated to the plaintiffs or their claims—does not support the district court's exercise of general jurisdiction. *See El-Fadl v. Cent. Bank of Jordan*, 75 F.3d 668, 675 (D.C. Cir. 1996) ("isolated and sporadic contacts unrelated to the claims in the instant case" insufficient to establish general jurisdiction); *cf. Pacas v. Showell Farms, Inc*., No. 95-1011, 1996 WL 192058, at *2 (4th Cir. Apr. 22, 1996) (unpublished) ("sales to a single customer . . . does not constitute the requisite minimum contacts necessary to satisfy 'fair play and substantial justice' and to establish general jurisdiction for a suit not related to the sale of that product"); *Atlantigas*, 290 F. Supp. 2d at 53 (exercising general jurisdiction over foreign corporation with only three District customers would "stretch the concept of general jurisdiction beyond what either the [long-arm] statute or due process permits").

2. Jurisdictional Discovery

Eisenberg and FCIG argue that even if only one District resident has opened an online account with IFX, the district court should have allowed discovery to determine (1) "how many transactions this one resident conducted, their dollar

volume [and] their currency," Appellants' Br. 19, and (2) whether IFX has any customers who reside in Virginia or Maryland and access the IFX website while at work in the District. *See id.*; Appellants' Reply Br. 6. The district court denied their discovery request. *See* Order Denying Mot. 1 (July 7, 2005).

It is well established that the "'district court has broad discretion in its resolution of discovery problems.'" *See Naartex Consulting Corp. v. Watt*, 722 F.2d 779, 788 (D.C. Cir. 1983) (quoting *In re Multi-Piece Rim Prods. Liab. Litig.*, 653 F.2d 671, 679 (D.C. Cir. 1981)), *cert. denied*, 467 U.S. 1210 (1984). In order to engage in jurisdictional discovery, the plaintiff "must have at least a good faith belief that such discovery will enable it to show that the court has personal jurisdiction over the defendant." *Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1090 (D.C. Cir. 1998). Such a request for jurisdictional discovery cannot be based on mere conjecture or speculation. *See Bastin v. Fed. Nat'l Mortgage Ass'n*, 104 F.3d 1392, 1396 (D.C. Cir. 1997).

With respect to the plaintiffs' first claim—that the district court should have allowed discovery to determine the number of the transactions (and their dollar amount) of IFX's single District user—the district court did not abuse its discretion in denying jurisdictional discovery. As discussed earlier, a business contact with one online customer in the District is insufficient to establish general jurisdiction over a foreign corporation. Therefore, no amount of discovery regarding that one customer's transactions would support general jurisdiction over IFX.

Regarding their second claim—that the district court should have allowed discovery to determine the number of Maryland and Virginia residents, if any, who may be IFX users at their District job sites—we cannot say that the district court abused its discretion in denying the plaintiffs discovery to pursue their

theory of "commuter jurisdiction." *See Bastin*, 104 F.3d at 1396 ("The district court does not abuse its discretion when it denies a discovery request that would amount to nothing more than a fishing expedition.").

Eisenberg and FCIG also argue, in a footnote, that they are entitled to discovery to determine whether IFX had any District customers who did not log onto its website. *See* Appellants' Br. 19 n.16. They describe the Walsh Declaration, discussed *supra* p. 9, as "oblique[]" and "evasive" because it states that IFX had "'no customers residing in the District of Columbia with an account opened *for use with the IFX online trading system.*'" *Id.* (quoting Decl. of Katie Walsh 2) (emphasis in Appellants' Br.). They assert that, by discussing only the lack of IFX online customers, the Declaration "leaves open whether there are District of Columbia residents that transact business with IFX, as large a broker as it is, on a regular and systematic basis but do not avail themselves of IFX's online trading capabilities." *Id.* Even assuming a "footnote" claim suffices, we reject it. Throughout the district court proceedings the plaintiffs consistently argued that IFX is within the court's general jurisdiction *based on its maintenance of an interactive website*. *See, e.g.*, Appellants' Mot. for Disc. 6 (Jan. 13, 2005) ("It is beyond cavil that the existence of a website business in the District of Columbia would subject IFX to general jurisdiction in the District of Columbia."); Appellant's Mem. in Opp'n 7 ("[IFX's] interactive website business, which IFX admits is used in the District of Columbia, subjects IFX to jurisdiction here."); Appellants' Br. 17 ("IFX has maintained a website that permits persons with accounts opened with it to do through it, in terms of number and value of transactions, large volumes of foreign exchange and precious metals trading. Such activity is sufficient for the assertion of general jurisdiction." (citations omitted)). The fact that the Walsh Declaration discussed only the number of IFX's online customers in the District should have come as

no surprise to Eisenberg and FCIG given how they framed their general jurisdiction argument.

### B. *Specific Jurisdiction*

Eisenberg and FCIG next argue that the district court has specific jurisdiction over IFX based on Cruden's "'regular' phone calls to Eisenberg in the District to solicit business and lure him to London." Appellants' Br. 21. A plaintiff seeking to establish specific jurisdiction over a non-resident defendant must establish that specific jurisdiction comports with the forum's long-arm statute, D.C. Code § 13-423(a), and does not violate due process. *See GTE*, 199 F.3d at 1347 (citing *United States v. Ferrara*, 54 F.3d 825, 828 (D.C. Cir. 2000)). In the district court, however, the plaintiffs failed to invoke the long-arm statute or any other statutory basis supporting specific jurisdiction. Instead, they relied on precedent from other jurisdictions. *See* Appellants' Mem. in Opp'n 10 (citing *Neal v. Jansen*, 270 F.3d 328, 333 (6th Cir. 2001); *Wein Air Alaska v. Brandt*, 195 F.3d 208, 215 (5th Cir. 1999); *Daldav Assocs., LP v. Lebor*, 2004 WL 728367, at *3 (N.D. Tex. Mar. 25, 2004); *Bahn v. Chicago Motor Club Ins.*, 98 Md. App. 559, 568 (1993)). The district court generously assumed that they had properly invoked the long-arm statute.[7] It then concluded that

---

[7]D.C. Code § 13-423(a), in relevant part, authorizes the court to:

exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's—

(1) transacting any business in the District of Columbia;

(2) contracting to supply services in the District of Columbia;

(3) causing tortious injury in the District of Columbia by an act or omission in the District of Columbia;

13

"subsection (a)(1) [was] the only subsection of the D.C. long-arm statute that [was] arguably applicable to the facts as presented by the plaintiffs." *FC Inv. Group*, 479 F. Supp. 2d at 38 n.1. After reviewing subsection (a)(1), the relevant case law and the plaintiffs' allegations, the district court concluded that Cruden's "'regular' phone calls into the District of Columbia from elsewhere d[id] not constitute 'transacting business' in the District of Columbia."[8] *FC Inv. Group*, 479 F. Supp. 2d at 39.

> (4) causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia.

D.C. Code § 13-423(a).

[8]The district court determined that subsection (a)(1)'s "transacting business" requirement could not be satisfied by telephone or fax contacts alone. *FC Inv. Group*, 479 F. Supp. 2d. at 39 (citing *Kopff v. Battaglia*, 425 F. Supp. 2d 76, 79–82 (D.D.C. 2006) (approximately 100 faxes insufficient); *Gibbons & Co. v. Roskamp Inst.*, 06cv0720, 2006 WL 2506646, at *3 (D.D.C. Aug. 28, 2006) (50–75 telephone calls/emails before signing contract in Florida insufficient); *Brunson v. Kalil & Co.*, 404 F. Supp. 2d 221, 234 (D.D.C. 2005) ("limited" telephone/fax contact insufficient); *Jung v. Ass'n of Am. Med. Colls.*, 300 F. Supp. 2d 119, 131 (D.D.C. 2004) (ten contacts per year insufficient); *COMSAT Corp. v. Finshipyards S.A.M.*, 900 F. Supp. 515, 523 (D.D.C. 1995) (eleven faxes/telephone calls insufficient); *Rahal v. Paris Sec. Corp.*, 82cv1439, 1982 U.S. Dist. LEXIS 17867, at *2, *6 (D.D.C. Oct. 27, 1982) (30 telephone calls insufficient); *Textile Museum v. F. Eberstadt & Co.*, 440 F. Supp. 30, 31–33 (D.D.C. 1977) (74 mailings and one personal consultation insufficient)).

In response, Eisenberg and FCIG argue that they intended to argue for specific jurisdiction under subsection (a)(4) and that the district court analyzed the wrong provision. *See* Appellants' Br. 23 ("[T]he District Court disregarded FCIG's argument, choosing to assume, instead, that FCIG was basing specific jurisdiction over IFX on IFX's transaction of business in the District."). Their contention is without merit. As noted earlier, it is the plaintiff's burden to establish the court's personal jurisdiction over the defendant. *Reuber*, 787 F.2d at 599. If Eisenberg and FCIG intended to rely on subsection (a)(4), it was their responsibility to do so in a manner that gave the district court fair notice thereof so that the court could rule on it and the issue could be preserved for appeal. This they did not do. *Cf. Nemariam v. Fed. Democratic Republic of Ethiopia*, 491 F.3d 470, 482–83 (D.C. Cir. 2007) ("[A]bsent exceptional circumstances, the court of appeals is not a forum in which a litigant can present legal theories that it neglected to raise in a timely manner in proceedings below." (quotations omitted)).[9]

### C. Conspiracy Jurisdiction

Eisenberg and FCIG argue further that specific jurisdiction exists "because IFX was a conspirator with Titan in wrongs that Titan perpetrated against FCIG through acts in the District." Appellants' Br. 25 (capitalization altered). In the proceedings below, they did not cite any statutory authority for this theory of jurisdiction; however, the district court assumed that they

---

[9]Even if their section 13-423(a)(4) argument were not waived, it is unlikely that it would be successful. Subsection (a)(4) requires the plaintiff to establish that the defendant "regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District." "Regular" telephone calls from Cruden to Eisenberg in the District do not suffice. *See supra* note 8.

intended to rely on the "agent" language of subsection (a)(1).[10] *See FC Inv. Group*, 479 F. Supp. 2d. at 38. Section 13-423(a)(1) authorizes the court to exercise personal jurisdiction over a defendant who, whether "directly or by an agent" (in this case, a co-conspirator), "transact[s] any business in the District of Columbia." D.C. Code § 13-423(a)(1); *see also Second Amend. Found.*, 274 F.3d at 523 ("Persons who enter the forum and engage in conspiratorial acts are deemed to 'transact business' there 'directly'; co-conspirators who never enter the forum are deemed to 'transact business' there 'by an agent.'" (quoting D.C. Code § 13-423(a)(1)). For "conspiracy" jurisdiction under subsection (a)(3), the plaintiff must allege "(1) the existence of a civil conspiracy . . . , (2) the defendant's participation in the conspiracy, and (3) an overt act by a co-conspirator within the forum, subject to the long-arm statute, and in furtherance of the conspiracy." *Kopff v. Battaglia*, 425 F. Supp. 2d. 76, 81 n.4 (D.D.C. 2006) (quotation omitted); *see also Edmond v. U.S. Postal Serv. Gen. Counsel*, 949 F.2d 415, 425 (D.C. Cir. 1991).

---

[10]Eisenberg and FCIG *now* claim they intended to base their "conspiracy jurisdiction" argument on subsection (a)(3). *See* Appellants' Br. 25. Subsection (a)(3) allows for personal jurisdiction over any defendant who, either directly or through an agent, "caus[es] tortious injury in the District of Columbia by an act or omission in the District of Columbia." D.C. Code § 13-423(a)(3). Whether their "conspiracy" jurisdiction claim is based on subsection (a)(1), as the district court assumed, or subsection (a)(3), as they now argue, it is without merit. Under both subsections they are obligated to plead with particularity facts sufficient to demonstrate the existence of a conspiracy between Titan and IFX. *See World Wide Minerals v. Republic oƒ Kazakhstan*, 296 F.3d 1154, 1168 (D.C. Cir 2002), *cert. denied*, 537 U.S. 1187 (2003). Because Eisenberg and FCIG failed to do so, *see* discussion *infra* pp. 17-19, their assertion of conspiracy jurisdiction fails regardless which subsection they rely upon.

The district court rejected this personal jurisdiction theory as well because, based on the allegations of the amended complaint, it did not appear that Titan had "committed . . . [any] act in furtherance of the conspiracy within the District of Columbia that was sufficient to subject [Titan] to jurisdiction under the D.C. long-arm statute." *FC Inv. Group*, 479 F. Supp. 2d at 42–43 (citing *Jin v. Ministry of State Sec.*, 355 F. Supp. 2d 72, 83 (D.D.C. 2004)). The amended complaint alleged that the conspiracy between Titan and IFX began on an unspecified date "[i]n or about 2002," Am. Comp. ¶ 15, and continued through "late 2003" and into January 2004. *See id.* ¶¶ 25, 26. During that time Titan sent account statements to Eisenberg in the District, *see id.* ¶¶ 10, 13; Titan employee Knott contacted Eisenberg at least twice, once to inform Eisenberg that Titan was replacing IG with IFX as Titan's currency broker and once to invite Eisenberg to IFX's London office, *see id.* ¶¶ 15, 18; and Titan board member Lichtenstein sent a false deposit slip to Eisenberg in the District after Eisenberg demanded that his funds be returned.[11] *See id.* ¶ 26. The district court concluded that the "unspecified—but undoubtedly small—number of mailings," Knott's meetings with Eisenberg and Lichtenstein's sending of the deposit slip were insufficient to assert personal jurisdiction over Titan. *FC Inv. Group*, 479 F. Supp. 2d at 43.[12]

[11]The amended complaint also alleged that Knott met with Eisenberg "several times" in the District "in 2001 and 2002." *See* Am. Comp. ¶ 14. Because the plaintiffs did not specify the dates of the meetings or the date on which IFX became Titan's business partner other than "[i]n or about "2002," *see* Am. Compl. ¶ 15, the district court was unable to determine if the meetings took place after Titan and IFX allegedly entered into a conspiracy. *FC Inv. Group*, 479 F. Supp. 2d at 43 n.4.

[12]Another district judge reached a different conclusion in a related action. In *FC Inv. Group LC v. Lichtenstein*, 441 F. Supp. 2d 3, 6 (D.D.C. 2006), the same plaintiffs brought suit against Lichtenstein,

Whether or not the district court correctly found Titan's District contacts insufficient, its finding of no personal jurisdiction over IFX on a conspiracy theory can be upheld on another ground. *See Amgen, Inc. v. Smith*, 357 F.3d 103, 111 (D.C. Cir. 2004) ("This court may affirm the dismissal of a complaint on different grounds than those relied upon by the district court." (citing *Bennett v. Spear*, 520 U.S. 154, 166 (1997))). In order "to establish jurisdiction under a theory of civil conspiracy, the plaintiff must plead with particularity overt acts within the forum taken in furtherance of the conspiracy." *World Wide Minerals v. Republic of Kazakhstan*, 296 F.3d 1154, 1168 (D.C. Cir. 2002) (quotation omitted), *cert. denied*, 537 U.S. 1187 (2003). "'[B]ald speculation' or a 'conclusory statement' that individuals are co-conspirators is insufficient to establish personal jurisdiction under a conspiracy theory." *Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020, 1031 (D.C. Cir. 1997) (quoting *Nartex Consulting Corp. v. Watt*, 722 F.2d 779, 787 (D.C. Cir. 1983)). We believe that Eisenberg and FCIG failed to plead the conspiracy with particularity. In support of their claim that IFX "had agreements

---

alleging, *inter alia*, fraud, civil conspiracy, civil aiding and abetting and negligent misrepresentation. *Id.* at 6. The district judge in that case concluded that it had personal jurisdiction over Lichtenstein. *Id.* at 11. The court acknowledged the relatively small number of contacts between Lichtenstein and Eisenberg that occurred in the District; however, it explained that "[m]ore important than the number of these contacts . . . is their significance," *id.* at 9 (citing *Neal v. Janssen*, 270 F.3d 328, 332 (6th Cir. 2001)), emphasizing that the contacts between Lichtenstein and Eisenberg were made for the purpose of "systematically communicating false information about Titan's corporate status, the relationship between Titan and IFX, the earnings on FCIG's phantom investments, and the return of FCIG's funds. These contacts were directed toward Mr. Eisenberg in the District of Columbia and had foreseeable effects here." *Id.*

and/or understandings with Titan and Martinic to commit fraud," Am. Comp. ¶ 39, they allege the following facts:

1. Lichtenstein testified (apparently in a related case) that IFX was Titan's "business partner" and that his points of contact at IFX were Charles Cruden and senior sales executive Andy Demetriades. *Id.* ¶ 15.

2. Cruden sent Lichtenstein a fax inquiring when he would be available to meet with IFX employee Carole Napoliello. *Id. ¶* 16

3. "[N]umerous electronic-mail communications . . . between various IFX employees and Martinic, including a December 9, 2002 email . . . confirm[] IFX and Titan's 'close and effective working relationship.'" *Id.*

4. Desiree Lichtman, Knott's assistant, worked with Cruden and Napoliello to create a PowerPoint presentation that Eisenberg saw while visiting IFX's London offices. *See id. ¶* 19. The PowerPoint presentation "indicated in no uncertain terms that Titan and IFX had established a joint venture with respect to foreign currency trading." *Id. ¶* 21. The PowerPoint presentation "prominently displayed IFX's logo." *Id.* It also discussed Titan's trading strategies and named several members of IFX's "Investment Committee." *Id.*

5. "On December 10, 2002, Titan wired $100,000 to IFX from Titan's account at US Bank." *Id. ¶* 22.

6. "On March 10, 2003 Cruden sent a letter to Lichtenstein outlining further 'potential revenue streams' for Titan and IFX . . . ." *Id. ¶* 24.

Even assuming the truth of these allegations, they fall short of the requirement that the plaintiff "plead with particularity 'the conspiracy as well as the overt acts within the forum taken in furtherance of the conspiracy.' " *Jungquist*, 115 F.3d at 1031 (quoting *Dooley v. United Techs. Corp.*, 786 F. Supp. 65, 78 (D.D.C. 1992)). The allegations establish only the existence of an on-going business relationship between Titan and IFX. They do not demonstrate that IFX "had agreements and/or understandings with Titan and Martinic to commit fraud," Am. Comp. ¶ 39, or that IFX "acted with knowledge that it was [participating in a] fraudulent currency exchange scheme," *id.* ¶ 15, and are therefore insufficient to establish a conspiracy theory of personal jurisdiction. *See First Chicago Int'l v. United Exch. Co.*, 836 F.2d 1375, 1378–79 (D.C. Cir. 1988) ("[T]he 'bare allegation' of a conspiracy or agency is insufficient to establish personal jurisdiction." (citing *McLaughlin v. McPhail*, 707 F.2d 800, 806 (4th Cir. 1983); *Lehigh Valley Indus. v. Birenbaum*, 527 F.2d 87, 93–94 (2d Cir. 1975)).

### D. RICO Jurisdiction

In Count IV of their amended complaint, Eisenberg and FCIG allege that IFX "violated the conspiracy section of RICO, 18 U.S.C. § 1962(d)." Appellant's Br. 29 (citing Am. Comp. ¶¶ 47-59). They argue that under RICO "the exercise of personal jurisdiction over IFX . . . was permissible, even in the absence of minimum contacts by IFX with the District," pursuant to RICO's "nationwide service of process provision, 18 U.S.C. § 1965(d)." *Id.*[13] But IFX counters that under RICO "at

---

[13]As with their other arguments, Eisenberg and FCIG failed to cite the correct statute for this theory of jurisdiction. *See* Appellants' Mot. in Opp'n 16 (Aug. 8, 2005) (incorrectly citing 18 U.S.C. § 1962(d) as basis for RICO jurisdiction). The district court, however, *sua sponte* corrected their error and then addressed—and rejected—their argument on the merits. *FC Inv. Group*, 479 F. Supp. 2d at 43–44.

least one defendant must have minimum contacts with the District before jurisdiction will be had over the other, non-resident defendant in the alleged RICO conspiracy." Appellee's Br. 27. 18 U.S.C. § 1965, entitled "Venue and process," provides in relevant part:

> (a) Any civil action or proceeding under this chapter against any person *may be instituted* in the district court of the United States for any district in which such person resides, is found, has an agent, or transacts his affairs.

> (b) In any action under section 1964 of this chapter in any district court of the United States in which it is shown that the ends of justice require that *other parties* residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof.

> (c) In any civil or criminal action or proceeding instituted by the United States under this chapter in the district court of the United States for any judicial district, subpenas issued by such court to *compel the attendance of witnesses* may be served in any other judicial district . . . .

> (d) All *other process* in any action or proceeding under this chapter may be served on any person in any judicial district in which such person resides, is found, has an agent, or transacts his affairs.

18 U.S.C. § 1965 (emphases added). There are differing views among our own district judges as well as in our sister circuits regarding the proper interpretation of this language. *Compare Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 942–48 (11th Cir. 1997) (finding nation-wide

jurisdiction under section 1965(d)), *and ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617, 626–27 (4th Cir. 1997) (same), *with PT United Can Co. Ltd. v. Crown Cork & Seal Co.*, 138 F.3d 65, 70 (2d Cir. 1998) (section 1965(b) provides for nationwide service of process only "where personal jurisdiction based on minimum contacts is established as to at least one defendant"), *and Butcher's Union Local No. 498 v. SDC Inv. Inc.*, 788 F.2d 535, 538 (9th Cir. 1986) (under section 1965(b) "the court must have personal jurisdiction over at least one of the participants in the alleged multidistrict conspiracy and the plaintiff must show that there is no other district in which a court will have personal jurisdiction over all of the alleged co-conspirators"); *compare also Dooley v. United Techs. Corp.*, 786 F. Supp. 65, 70 (D.D.C. 1992) (under section 1965(d) "[m]inimum contacts with the forum state, as required under the traditional long-arm jurisdiction analysis, is not necessary"), *with World Wide Minerals Ltd. v. Republic of Kazakhstan*, 116 F. Supp. 2d. 98, 108 (D.D.C. 2000) ("reject[ing] the notion that the federal RICO statute . . . provide[s] a basis for nation wide jurisdiction"), *remanded on other grounds*, 296 F.3d 1154 (D.C. Cir. 2002), *cert. denied*, 537 U.S. 1187 (2003), *and AGS Int'l Servs. v. Newmont USA Ltd*., 346 F. Supp. 2d 64, 87 (D.D.C. 2004) (same).

Having considered the arguments of the parties, as well as the reasoning of our sister circuits on this question, we are persuaded to adopt the Second Circuit's reasoning. In *PT United Can Co. Ltd. v. Crown Cork & Seal Co.*, 138 F.3d 65, 70 (2d Cir. 1998), the Second Circuit explained that section "1965 must be read to give effect to all its sections in a way that renders a coherent whole." It stated:

> Reading all of the subsections of § 1965 together, the court finds that § 1965 does not provide for nationwide personal jurisdiction over every defendant in every civil RICO case, no matter where the

defendant is found. First, § 1965(a) grants personal jurisdiction over *an initial defendant* in a civil RICO case to the district court for the district in which that person resides, has an agent, or transacts his or her affairs. In other words, a civil RICO action can only be brought *in a district court where personal jurisdiction based on minimum contacts is established as to at least one defendant*.

Second, § 1965(b) provides for nationwide service and jurisdiction over "other parties" not residing in the district, who may be *additional defendants of any kind, including co-defendants, third party defendants, or additional counter-claim defendants*. This jurisdiction is not automatic but requires a showing that the "ends of justice" so require. This is an unsurprising limitation. There is no impediment to prosecution of a civil RICO action in a court foreign to some defendants if it is necessary, but the first preference, as set forth in § 1965(a), is to bring the action where suits are normally expected to be brought. Congress has expressed a preference in § 1965 to avoid, where possible, haling defendants into far flung fora.

Next, § 1965(c) simply refers to service of subpoenas on witnesses. Thus, § 1965(d)'s reference to "[a]ll other process," means process other than a summons of a defendant or subpoena of a witness. This interpretation, one which gives meaning to the word "other" by reading sequentially to understand "other" as meaning "different from that already stated in subsections (a)–(c)," gives coherent effect to all sections of § 1965, and effectively provides for all eventualities without rendering any of the sections duplicative, without impeding RICO actions and without unnecessarily burdening parties.

*Id.* at 71–72 (emphases added) (footnote omitted).[14] The Second Circuit endorsed the Ninth Circuit's holding in *Butcher's Union*, 788 F.2d at 538, that "[f]or nationwide service to be imposed under section 1965(b), the court must have personal jurisdiction over at least one of the participants in the alleged multidistrict conspiracy and the plaintiff must show that there is no other district in which a court will have personal jurisdiction over all of the alleged co-conspirators." *Id.*, *as cited in PT United Can*, 138 F.3d at 72 (adopting "the natural reading given to § 1965(b) by the 9th Circuit in *Butcher's Union*"). In addition, the Tenth Circuit, the only circuit to have considered section 1965 since *PT United Can*, has also followed its interpretation, finding its reasoning "persuasive and consistent with congressional intent." *Cory v. Aztec Steel Bldg., Inc.*, 468 F.3d 1226, 1231 (10th Cir. 2006). Because the district court is otherwise without personal jurisdiction over IFX, the sole defendant, it is also without RICO jurisdiction over IFX.

For the foregoing reasons, the judgment of the district court is affirmed.

*So ordered.*

---

[14]We need not, and therefore do not, pass on the meaning of section 1965(b)'s "ends of justice" language.