# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued September 22, 2020      Decided December 29, 2020

No. 19-7129

RINAT AKHMETSHIN,
APPELLANT

v.

WILLIAM BROWDER,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:18-cv-01638)

*Michael Tremonte* argued the cause for appellant. With him on the briefs was *Alexandra Elenowitz-Hess*.

*Michael J. Gottlieb* argued the cause and filed the brief for appellee. With him on the brief was *Stephanie L. Miner*.

Before: TATEL and KATSAS, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

Dissenting opinion filed by *Circuit Judge* TATEL.

EDWARDS, *Senior Circuit Judge*: On July 12, 2018, Appellant Rinat Akhmetshin, a resident of the District of Columbia ("District") and a dual citizen of the United States and the Russian Federation, filed a defamation action in the District Court against Appellee William Browder, a nonresident alien and citizen of the United Kingdom. *See* J.A. 7-20. The District Court had subject-matter jurisdiction on diversity-of-citizenship grounds. *See* 28 U.S.C. § 1332(a)(2).

Akhmetshin's complaint cites several incidents to support his claim of defamation: (1) two tweets posted by Browder in which he identified Akhmetshin as a "Russian GRU officer" and a "Russian intelligence asset"; (2) a statement published in *Business Insider* in which Browder described Akhmetshin as "a member of Putin's secret police"; and (3) a television interview during which Browder described Akhmetshin as, "by all accounts, some kind of shady former Soviet spy, current spy operator in Washington." Browder moved to dismiss the action on several grounds, including under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction. *See* J.A. 59. Because Browder made his allegedly defamatory statements outside of the District of Columbia, Akhmetshin sought to establish personal jurisdiction over Browder under section 13-423(a)(4) of the District's long-arm jurisdiction statute. D.C. CODE § 13-423(a)(4) (2001).

Section 13-423(a)(4) authorizes the "exercise [of] personal jurisdiction over a person" who has "caus[ed] tortious injury in the District of Columbia by an act or omission outside the District of Columbia." Any such party over whom personal jurisdiction is sought must have satisfied one of three "plus factors" *within the District*. *See Crane v. Carr*, 814 F.2d 758, 763 (D.C. Cir. 1987). These factors are "[1] regularly do[ing] or solicit[ing] business, [2] engag[ing] in any other persistent course of conduct, or [3] deriv[ing] substantial revenue from

goods used or consumed, or services rendered." D.C. CODE § 13-423(a)(4). However, "entr[ies] into the District . . . by nonresidents for the purpose of contacting federal governmental agencies [or instrumentalities]" do not factor into the jurisdictional calculus. *Env't Rsch. Int'l, Inc. v. Lockwood Greene Eng'rs, Inc.*, 355 A.2d 808, 813 (D.C. 1976) (en banc) (explaining the "government contacts exception").

The record in the case indicates that, since 2009, Browder has traveled to the District of Columbia on a number of occasions. While on these trips, he has, among other things, met with members of Congress and provided testimony before governmental bodies, appeared on television and podcasts, given interviews to publications, participated in panel discussions at nongovernmental organizations ("NGOs") and think tanks, and attended personal events such as social dinners and a funeral. *See*, *e.g.*, J.A. 197-98, 202, 203, 204, 206, 214, 235-36, 248, 249, 251, 333, 336. It is undisputed that Browder's visits to the District often have been related to his advocacy for measures holding human rights abusers in Russia accountable for their misdeeds. *See* J.A. 39-40, 149. Prior to 2012, Browder lobbied Congress for passage of the Russia and Moldova Jackson-Vanik Repeal and Sergei Magnitsky Rule of Law Accountability Act of 2012 (the "Magnitsky Act"). *See* Pub. L. No. 112-208, 126 Stat. 1496 (2012). After the passage of the Magnitsky Act in 2012, Browder's trips to the District continued, both to promote the Act and to participate in a variety of professional and social events. *See*, *e.g.*, J.A. 239-40.

The District Court granted Browder's motion to dismiss for lack of personal jurisdiction. *Akhmetshin v. Browder*, 407 F. Supp. 3d 11, 14 (D.D.C. 2019). The court agreed with Browder that virtually all of his contacts with the District were subject to the government contacts exception; the court additionally found that Browder's remaining contacts with the

District, based on the then-existing record, were not sufficient for jurisdiction under the District's long-arm statute. *Id.* at 24-25. The District Court also denied jurisdictional discovery, as it believed that any additional contacts with the District that Akhmetshin might uncover would likely be excluded under the government contacts exception. *Id.* at 28.

Based on the current record, we cannot determine whether Browder's non-government contacts with the District satisfy any of the three "plus factors" required under the long-arm statute. The District Court relied on an overly broad construction of the government contacts exception in granting judgment for Browder and denying jurisdictional discovery. Therefore, we have no sound basis upon which to credit the District Court's judgment. Accordingly, we are constrained to vacate the judgment under review and remand the case for jurisdictional discovery.

## I.  BACKGROUND

### A. Browder's Background and Contacts with the District of Columbia

Browder is a financier who lives and works in the United Kingdom. *See* J.A. 34. In 1996, he founded Hermitage Capital Management ("Hermitage"), a hedge fund specializing in former Soviet markets. *See* J.A. 8, 10, 217. In 2008, Sergei Magnitsky, one of Hermitage's lawyers, allegedly discovered that Russian government officials and members of organized crime had used Hermitage portfolio companies to perpetrate a $230 million tax fraud scheme. *See* J.A. 39-40, 108. Magnitsky was then arrested by Russian authorities and, in November 2009, died in a Russian prison. *See* J.A. 39-40, 137.

After being notified of Magnitsky's death, Browder sought accountability for those he believed responsible. *See, e.g.*, J.A.

196-98. In the United States, his efforts took the form of lobbying and advocating for the Magnitsky Act, which authorizes the President of the United States to impose sanctions against individuals who were responsible for Magnitsky's death, who have benefitted financially from his death, or who were involved in the underlying tax fraud scheme. *See* Magnitsky Act §§ 404, 406. In June 2009, Browder testified before the Commission on Security and Cooperation in Europe (the "Helsinki Commission") – an independent commission of the federal government – regarding the circumstances of Magnitsky's detention. *See* J.A. 16. From 2010 through 2012, Browder met with members of Congress and their staffs, also testifying before various Congressional bodies. *See* J.A. 10, 16, 197-98. Those efforts culminated in the 2012 enactment of the Magnitsky Act. *See* J.A. 10.

Since then, according to Akhmetshin, Browder has visited the District a number of times. Those trips have included testimony before a Congressional committee on one occasion in 2015, as well as testimony before the Helsinki Commission and a separate Congressional committees on two separate trips in 2017. *See* J.A. 16-17. The trips have also included attendance at an April 2013 reception, *see* J.A. 184, 325-26, sitting for an interview published in *BBC News* magazine in December 2013, *see* J.A. 181, 211-33, attendance at a book release event in January 2014, *see* J.A. 184, 327-34, participation in an April 2015 panel discussion at the National Endowment for Democracy, *see* J.A. 181, 234-37, sitting for an interview published in June 2016 in *The American Interest*, *see* J.A. 181-82, 238-47, sitting for three interviews on two separate dates in July 2017 with cable news outlets and a podcast, *see* J.A. 182, 248-51, sitting for interviews on five separate dates in April, July, August, and November 2018 with television and print news outlets, *see* J.A. 182-83, 252-54, 256-

62, and attendance at a funeral in the District in September 2018, *see* J.A. 184, 335-36. Browder also hired a law firm in the District in 2016 in connection with efforts to defend himself and the Magnitsky Act from detractors. *See* J.A. 264-71.

In 2015, Browder authored a book, *Red Notice*, describing his personal background, the circumstances surrounding Magnitsky's death, the passage of the Magnitsky Act, and subsequent developments. *See* J.A. 17, 413-15. Akhmetshin's defamation complaint refers to *Red Notice* as a "best-seller." Compl. ¶ 68, Joint Appendix ("J.A.") 18. Hermitage entities own and license the copyright to *Red Notice*, and they engaged Simon & Schuster, Inc. ("Simon & Schuster") to publish the book, which is sold in the District. *See* J.A. 372-73. According to one of Hermitage's directors, Browder "does not personally own any property rights in the book" and "has personally earned no revenues as a result of the sales of *Red Notice*." Decl. of Ivan Cherkasov ¶¶ 3, 6, J.A. 372-73. Nonetheless, in 2015, Browder made at least three appearances in the District at events promoting *Red Notice*. *See* J.A. 153, 203, 204.

## B. The Instant Case

Over the last five years, Browder and Akhmetshin have found themselves increasingly at odds. *See* J.A. 11-14. These tensions generally relate to Akhmetshin's public advocacy contradicting Browder's version of the events that resulted in Magnitsky's death, including accusations that Browder and Magnitsky – not Russian government officials – perpetrated the underlying tax fraud. *See* J.A. 12-13. Akhmetshin's efforts on this front have included lobbying for the removal of Magnitsky's name from the Magnitsky Act. *See* J.A. 12.

On July 14, 2017, it was widely reported that Akhmetshin had attended a June 9, 2016 meeting with, among others, Donald Trump, Jr. in New York City, at which the Magnitsky

Act had been discussed. *See* J.A. 14, 35, 90, 108. Shortly after the news broke, Browder posted two tweets identifying Akhmetshin as a "Russian GRU officer," Decl. of Melissa Shube, Ex. A, J.A. 88, and a "Russian intelligence asset," Decl. of Melissa Shube, Ex. B, J.A. 95. Each tweet linked to an online article reporting on the June 9, 2016 meeting and containing information on Akhmetshin's background. *See* J.A. 88-93, 95-105. An article published in *Business Insider*, also on July 14, 2017, included the following quote from Browder: "So in my opinion you had a member of Putin's secret police directly meeting with the son of the future next president of the United States asking to change U[.]S[.] sanctions policy crucial to Putin." Decl. of Melissa Shube, Ex. C, J.A. 109. Four days later, during a television appearance, Browder described Akhmetshin as, "by all accounts, some kind of shady former Soviet spy, current spy operator in Washington." Compl. ¶ 51, J.A. 15.

On July 12, 2018, Akhmetshin filed a complaint against Browder in the District Court, alleging that Browder's two tweets, his statement to *Business Insider*, and his statement on television were defamatory. *See* J.A. 7-20. On November 30, 2018, Browder filed a Motion to Dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction and Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. *See* J.A. 25. Regarding personal jurisdiction, Browder asserted that his conduct within the District was not sufficient to satisfy any of the "plus factors" required by D.C. Code § 13-423(a)(4). *See* J.A. 50-58. According to Browder, his contacts with the District were almost entirely related to lobbying and advocacy efforts and, therefore, under the government contacts exception, these contacts could not be considered in the calculus regarding whether he was subject to personal jurisdiction in the District of Columbia. *See* J.A. 50, 53-57.

Akhmetshin filed an Opposition to the Motion to Dismiss. *See* J.A. 127-79. On the personal jurisdiction issue, he argued that the government contacts exception had no play in the personal jurisdiction calculus because Browder is a nonresident alien who lacks sufficient ties to the United States. *See* J.A. 149-52. He also argued that Browder's contacts with the District satisfied all three plus factors in the District's long-arm statute. *See* J.A. 153-56. In the alternative, Akhmetshin requested limited jurisdictional discovery to further establish Browder's contacts with the District. *See* J.A. 179.

On September 16, 2019, the District Court granted Browder's Motion to Dismiss for lack of personal jurisdiction, denied Akhmetshin's request for discovery, and dismissed the case without prejudice. *Akhmetshin*, 407 F. Supp. 3d at 14. The District Court applied the terms of the District's long-arm statute under D.C. Code § 13-423(a)(4) and determined that it could not exercise personal jurisdiction over Browder based on revenues coming from sales of *Red Notice* under the third plus factor because all revenues went to Simon & Schuster and Hermitage corporate entities, not Browder. *Id.* at 21-22. The District Court also found that "Akhmetshin's allegations fail to show that Mr. Browder conducted or solicited business in the District" sufficient to satisfy the first factor under the long-arm statute. *Id.* at 22.

The District Court then analyzed whether Browder's contacts with the District constituted a "persistent course of conduct" – the second plus factor under the District's long-arm statute. *Id.* at 22-25; *see* D.C. CODE § 13-423(a)(4). First, the District Court rejected Akhmetshin's argument that the government contacts exception does not apply to nonresident aliens. *Akhmetshin*, 407 F. Supp. 3d at 23-24. Second, the District Court excluded all of Browder's direct contacts with governmental actors from its jurisdictional calculus. *Id.* at 24.

Third, the District Court also excluded from the jurisdictional calculus virtually all of Browder's other contacts with the District – including his media interviews and book promotion events – under the exception. *Id.* at 24-25, 24 n.15. In so doing, the court expressed its view that the government contacts exception operated to exclude from the calculus all conduct within the District by "a non-resident defendant who 'concerns [himself] with federal legislation, regulations, and policies' in an effort to 'advance [the non-resident defendant's federal] policy agenda.'" *Id.* at 24 (alterations in original) (quoting *United Therapeutics Corp. v. Vanderbilt Univ.*, 278 F. Supp. 3d 407, 418 (D.D.C. 2017)).

Next, the District Court addressed Akhmetshin's claims that Browder "ha[d] traveled to the District on several occasions for certain engagements (*i.e.* dinner, reception, meetings, private event, and funeral) between 2009 and 2018." *Id.* at 25. Akhmetshin had also noted that Browder "retained a law firm with an office in the District, . . . sent two demand letters to NBC Universal regarding a published article, and . . . stated in a telephone conversation that he would pursue legal action against a museum located in the District." *Id.* The District Court concluded that these contacts did "not warrant the exercise of specific personal jurisdiction over a non-resident defendant." *Id.* The District Court thus determined that because "Akhmetshin ha[d] failed to demonstrate that Mr. Browder's other travel to the District was not merely sporadic or occasional[,] . . . the Court [would] not exercise personal jurisdiction over Mr. Browder under D.C. Code § 13–423(a)(4)." *Id.*

The District Court also denied Akhmetshin's request for jurisdictional discovery. *Id.* at 26-28. According to the court, Akhmetshin had not "demonstrated a 'good faith belief'" that Mr. Browder's personal appearances in the District would

establish personal jurisdiction because 'the government contacts principle would exclude [them] from the personal jurisdiction calculus.'" *Id.* at 28 (alteration in original) (quoting *NBC-USA Hous., Inc. Twenty-Six v. Donovan*, 741 F. Supp. 2d 55, 61 (D.D.C. 2010)). Thus, the District Court found that "Akhmetshin ha[d] failed to show that jurisdictional discovery [wa]s warranted" and dismissed the case. *Id.*

On October 11, 2019, Akhmetshin filed a timely notice of appeal to this court. He argues that the District Court erred in finding that it lacked personal jurisdiction over Browder, in denying jurisdictional discovery, and in dismissing the case rather than merely his complaint.

## II. ANALYSIS

### A. Standard of Review

"A personal jurisdiction analysis requires that a court determine whether [1] jurisdiction over a party is proper under the applicable local long-arm statute and [2] whether it accords with the demands of due process." *United States v. Ferrara*, 54 F.3d 825, 828 (D.C. Cir. 1995) (as amended July 28, 1995). The parties agree that the applicable long-arm statute is D.C. Code § 13-423. *See Crane*, 814 F.2d at 762.

We review dismissal of an action for lack of personal jurisdiction *de novo*. *See FC Inv. Grp. LC v. IFX Mkts., Ltd.*, 529 F.3d 1087, 1091 (D.C. Cir. 2008). The plaintiff bears the burden of establishing that the court has personal jurisdiction over the defendant. *Id.* Denial of jurisdictional discovery is reviewed for abuse of discretion. *Id.*

**B. The Government Contacts Exception**

In this case, the merits of Akhmetshin's arguments rest largely on the degree to which Browder's contacts in the District should be excluded from the jurisdictional calculus under the government contacts exception. Because we must apply District law in addressing this issue, we begin our analysis by examining the scope of the government contacts exception as enunciated by the District of Columbia Court of Appeals (the "Court of Appeals").

**1. Development of the Government Contacts Exception and Applicability to Nonresident Aliens**

In 1976, the Court of Appeals, sitting en banc, held that

> entry into the District of Columbia by nonresidents for the purpose of contacting federal governmental agencies is not a basis for the assertion of in personam jurisdiction.

*Env't Rsch. Int'l*, 355 A.2d at 813. The court explained that this "government contacts exception" is grounded in "the unique character of the District as the seat of national government and in the correlative need for unfettered access to federal departments and agencies for the entire *national citizenry*." *Id.* (emphasis added) (internal quotation marks omitted). The court added that "[t]o permit . . . courts to assert personal jurisdiction over nonresidents whose sole contact with the District consists of dealing with a federal instrumentality not only would pose a threat to free public participation in government, but also would threaten to convert the District of Columbia into a national judicial forum." *Id.*

The decision in *Environmental Research International* indicates that the Court of Appeals viewed the government contacts exception as applying only to members of the "national citizenry." *Id.* This suggests that the exception does not apply to nonresident aliens. Later panel decisions of the Court of Appeals, however, have left the scope of the government contacts exception "unsettled." *Companhia Brasileira Carbureto de Calicio v. Applied Indus. Materials Corp.*, 640 F.3d 369, 371 (D.C. Cir. 2011); *see Naartex Consulting Corp. v. Watt*, 722 F.2d 779, 786-87 (D.C. Cir. 1983) (addressing possible tension between Court of Appeals decisions on the government contacts exception).

To complicate matters further, in 1978, a "decision of a D.C. Court of Appeals panel [appears to] have limited the government contacts exception to cases in which the contacts with the federal government were an exercise of First Amendment rights." *Companhia Brasileira*, 640 F.3d at 372 (citing *Rose v. Silver*, 394 A.2d 1368, 1372-74 (D.C. 1978)). And in 1990, in a decision responding to a certified question from this court, the Court of Appeals framed an inquiry regarding the government contacts exception as "whether the defendants can assert a First Amendment interest . . . , thereby permitting invocation of the 'government contacts' principle." *Lex Tex Ltd., Inc. v. Skillman*, 579 A.2d 244, 249 (D.C. 1990). If the government contacts exception applies only to defendants who possess cognizable First Amendment interests, its application to nonresident aliens such as Browder is uncertain. *See United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990) (noting that "textual exegesis . . . suggests that 'the people' protected by the . . . First and Second Amendments . . . refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community").

We have found no case, nor has Browder directed us to one, in which the Court of Appeals has applied the government contacts exception to the conduct of nonresident aliens. Instead, Browder relies on two opinions from this court, issued after *Environmental Research International*, in cases in which a defendant was a nonresident alien. *See Stabilisierungsfonds fur Wein v. Kaiser Stuhl Wine Distribs. Pty. Ltd.*, 647 F.2d 200 (D.C. Cir. 1981); *Donahue v. Far E. Air Transp. Corp.*, 652 F.2d 1032 (D.C. Cir. 1981). The decisions in both cases simply reference, but do not apply, the government contacts exception. *See Stabilisierungsfonds*, 647 F.2d at 205 n.11; *Donahue,* 652 F.2d at 1038 n.9. According to Browder, these decisions establish that the government contacts exception applies to nonresident alien defendants. We do not agree that the decisions go as far as Browder claims.

In *Stabilisierungsfonds*, we held that an Australian wine producer and its distribution subsidiary were subject to long-arm jurisdiction under D.C. Code § 13-423(a)(1) and (a)(4) as a result of wine sales in the District. *See* 647 F.2d at 205-06. In a footnote, we stated the following:

> Counsel for [the plaintiffs] noted at oral argument that [the Australian defendants] may have acted in the District in connection with their registration of [a trade]mark. The District of Columbia, however, has grafted a "governmental contacts" exception to its long-arm statute. That exception holds that the local courts do not exercise personal jurisdiction over a nonresident on the basis of activity in the District relating solely to dealings with the federal government. *We do not rest any part of our decision on the Australians' contacts with federal offices*.

*Id.* at 205 n.11 (emphasis added) (internal citation omitted). It is theoretically possible – as Browder urges – to read the last sentence of the footnote as an application of the government contacts exception to the conduct of nonresident alien defendants. In our view, however, the sounder reading is that the court took no position on the issue. The Court found that personal jurisdiction existed without regard to the nonresident aliens' government contacts. *Id.* at 205-06. In other words, our statement at the end of the footnote appears to have been an observation about the general state of District law, rather than a rule we applied in that particular case.

In *Donahue*, which resulted from a series of consolidated suits related to an airplane crash in Taipei, we held that a Taiwanese airline was not subject to personal jurisdiction in Guam, Hawai'i, California, New York, or the District. *See* 652 F. 2d at 1033-34. While arguing that courts in Guam, Hawai'i, New York, and the District had general personal jurisdiction over the airline, plaintiffs "rel[ied] . . . solely upon a theory of 'aggregated contacts' with the United States as a whole." *Id.* at 1038. We rejected that basis for jurisdiction, explaining that it "ha[d] attracted only limited support in federal question cases" and "ha[d] made no mark at all in cases" arising under state law in federal courts. *Id.* at 1038-39.

During the court's discussion of the defendant's contacts with Guam, Hawai'i, New York, and the District, it was noted that plaintiffs believed the airline's interactions with the Civil Aeronautics Board, located in the District, should have factored into the jurisdictional calculus. *See id.* at 1038. In response, in a footnote, the court observed that "[d]ealings with the federal government, standing alone, do not provide a basis for District of Columbia exercise of personal jurisdiction over a nonresident." *Id.* at 1038 n.9 (citing *Env't Rsch. Int'l*, 355 A.2d at 813). Browder, again, relies on this footnote as conclusive

evidence that we have applied the government contacts exception to the conduct of a nonresident alien defendant.

As with *Stabilisierungsfonds*, we do not believe this footnote carries the precedential weight that Browder urges. Unlike in *Stabilisierungsfonds*, we found in *Donahue* that the District Court lacked personal jurisdiction over the defendant. *See id.* at 1039. But, as in *Stabilisierungsfonds*, that outcome did not depend on the government contacts exception. Instead, we believed jurisdiction did not exist in the District – or in Guam, Hawai'i, or New York – because "aggregated contacts" between different fora could not lead to general personal jurisdiction over a defendant in any one of them. *Id.* at 1038-39. Whether the airline's contacts with the Civil Aeronautics Board were excluded from the jurisdictional calculus was, therefore, immaterial in determining whether general personal jurisdiction over the airline existed in any United States court.

In sum, in neither *Stabilisierungsfonds* nor *Donahue* did this court unambiguously apply the government contacts exception to the contacts of nonresident alien defendants. Nor did we engage with the difficult question of whether the government contacts exception covers such defendants. As a result, these decisions establish no clear precedent regarding whether the government contacts exception applies to a nonresident alien.

Browder further notes that in several cases decided since *Environmental Research International*, the District Court appears to have assumed that the government contacts exception applies to the contacts of nonresident aliens. *See*, *e.g.*, *LG Display Co. v. Obayashi Seikou Co.*, 919 F. Supp. 2d 17, 26-27 (D.D.C. 2013); *App Dynamic ehf v. Vignisson*, 87 F. Supp. 3d 322, 327-29 (D.D.C. 2015). He is correct. These decisions, however, do not establish that the Court of Appeals

would hold that the government contacts exception applies to the contacts of nonresident aliens.

If Browder cannot take advantage of the government contacts exception because he is a nonresident alien, then it seems clear that his many contacts with the District would be sufficient to establish personal jurisdiction under the District long-arm statute. It is significant, albeit not dispositive, that in several cases the District Court has consistently assumed that the government contacts exception applies to the contacts of nonresident aliens, our court has cited the exception without ever doubting its efficacy in cases involving nonresident aliens, and the D.C. Court of Appeals has never expressly indicated that the exception does not apply to nonresident aliens. And Browder compellingly argues that "nonresident aliens who travel to the District to advocate for the adoption of federal legislation do not (and should not) expect to be sued in the District for their extraterritorial acts." Br. for Def.-Appellee at 15. Nevertheless, we are reluctant to reach this conclusion because the Court of Appeals' decision in *Environmental Research International* indicates only that the government contacts exception applies to members of "the entire *national citizenry*," 355 A.2d at 813 (emphasis added), with no reference to nonresident aliens.

If the only dispositive legal question outstanding in this case was whether the government contacts exception applies to nonresident aliens, certification to the Court of Appeals likely would be appropriate. But there are other grounds that might dispose of this case without any need to determine whether the government contacts exception applies to nonresident aliens. In these circumstances, we believe that the wisest course for now is to simply assume, without deciding, that the government contacts exception applies to the contacts of nonresident aliens. In other words, we will assume that Browder's direct contacts

with members, agents, or instrumentalities of the federal government, both before and after enactment of the Magnitsky Act, may be excluded from the jurisdictional calculus. There is nothing that compels a different approach at this stage of the proceedings.

While we "recognize that we are leaving certain legal questions . . . unresolved[,] . . . these issues may become moot" depending on what happens in this case moving forward. *See United States v. Todd*, 287 F.3d 1160, 1164-65 (D.C. Cir. 2002). Thus, as we explain below, we will remand the matter to the District Court for jurisdictional discovery. Then, using the proper legal standard for the application of the government contacts exception, the District Court will recalculate Browder's contacts with the District. The recalculation will determine whether, without regard to any actual government contacts, Browder's nonexcluded contacts within the District satisfy the District's long-arm statute. If the District Court's recalculation of the jurisdictional factors indicates that Browder is subject to personal jurisdiction under the District's long-arm statute, then we may not have to determine whether the government contacts exception applies to nonresident aliens.

## 2. The Limited Scope of the Government Contacts Exception

Although there may be a question as to whether the government contacts exception extends to nonresident aliens, the meaning and scope of the exception are otherwise straightforward with respect to the matters at issue in this case. The District of Columbia Court of Appeals has made it clear that the government contacts exception applies when nonresidents' "*sole* contact with the District consists of *dealing with a federal instrumentality*." *Env't Rsch. Int'l*, 355 A.2d at

813 (emphases added). The court also stated that the exception "finds its source in the . . . need for unfettered access to *federal departments and agencies*." *Id.* (emphasis added). Thus, under the controlling District law, "entry into the District of Columbia by nonresidents *for the purpose of contacting federal governmental agencies* is" the key to the analysis. *Id.* (emphasis added). Based on this controlling precedent, only direct contacts with members, agents, or instrumentalities of the federal government may be excluded from the jurisdictional calculus. In our view, the scope of the government contacts exception goes no further than this.

Browder has not identified any controlling authority postdating *Environmental Research International* that applies the government contacts exception to conduct not involving direct contact with members of the federal government or government agencies. Instead, Browder relies heavily on two District Court cases for support. *See Inv. Co. Inst. v. United States*, 550 F. Supp. 1213, 1216-17, 1217 n.6 (D.D.C. 1982); *United Therapeutics Corp. v. Vanderbilt Univ.*, 278 F. Supp. 3d 407, 417-19 (D.D.C. 2017). These decisions cannot carry the day for Browder.

In *Investment Company Institute*, the District Court excluded a broker-dealer's application for membership in the National Association of Securities Dealers ("NASD") from the jurisdictional calculus. 550 F. Supp. at 1217. The NASD was a "self-regulatory trade association of the . . . securities industry" that was "registered with the [Securities and Exchange Commission]" and headquartered in the District. *Id.* at 1217 n.6. It is true, as Browder notes, that NASD was not technically an instrumentality of the federal government. However, "[s]ubmission to [NASD's] regulation [wa]s [an] alternative to direct regulation by the SEC." *Id.* (citing 15 U.S.C. § 78o-3; *First Jersey Sec., Inc. v. Bergen*, 605 F.2d 690,

692-93 (3d Cir. 1979)). An application to a trade association that Congress *explicitly authorized to exercise regulatory authority* presents a significantly different question for purposes of the government contacts exception than Browder's post-2012 contacts with the District, which have included conduct such as interviews with media outlets and panel discussions at NGOs.

The situation in *United Therapeutics* is less clear-cut. In that case, Vanderbilt University's District-based Office of Federal Relations performed, among other things, lobbying and general advocacy work before federal officials on behalf of the university. *See United Therapeutics*, 278 F. Supp. 3d at 418. It also "work[ed] closely with many higher education associations and coalitions headquartered in [the District], . . . in tandem with other Tennessee colleges and universities . . . to advance its policy agenda," *id*. (internal quotation marks omitted), "host[ed] a two-day . . . Policy and Advocacy seminar . . . focuse[d] on the Office's federal policy advocacy work," *id.* at 419, and "r[an] an unpaid summer internship program for Vanderbilt students" focused on federal public policy, *id.* The District Court excluded such conduct from the jurisdictional calculus under the government contacts exception, as it "concern[ed] federal *public policy*." *Id.* Browder argues that these activities were analogous to his general advocacy efforts in the District after enactment of the Magnitsky Act. We do not agree. The conduct at issue in *United Therapeutics* appears to have been more closely tied to "the unique character of the District as the seat of national government" than many of Browder's post-2012 activities in the District. *See Env't Rsch. Int'l*, 355 A.2d at 813.

In any event, even if *Investment Company Institute* and *United Therapeutics* stretch the limits of the government contacts exception, these decisions are not controlling

precedent. Our research indicates that there is no published decision from the D.C. Court of Appeals or from this court supporting Browder's position that the government contacts exception extends beyond what the court said in *Environmental Research International. See id.*

With the correct standard in mind, we find that other than his direct contacts with the government, Browder's conduct in the District after 2012 – such as book promotional appearances, discussions and speeches at think tanks, and interviews in both print and audio-visual media – should be included in the jurisdictional calculus. The District Court's exclusion of those contacts under the government contacts exception was error.

Since the enactment of the Magnitsky Act, Browder's contacts with the District – based only on publicly available sources – have included attendance at an April 2013 reception, sitting for an interview published in December 2013, attendance at a book release event in January 2014, participation in an April 2015 panel discussion, three book events on separate dates in February and April 2015, sitting for an interview published in June 2016, sitting for three interviews on two separate dates in July 2017, sitting for interviews on five separate dates in April, July, August, and November 2018, and attendance at a funeral in the District in September 2018. *See* J.A. 180-84. He also hired a law firm in the District in 2016. *See* J.A. 264-71. This conduct should be factored into the jurisdictional calculus, as it did not consist of direct contact with members, agents, or instrumentalities of the federal government.

To hold otherwise would mean that a defendant who has even a single contact with the federal government in support of a policy agenda may then exclude *all* contacts with the District that can be somehow construed as efforts to advance that

agenda. A defendant could make countless trips to the District for purposes other than "contacting [the] federal government[]" while having those trips excluded from the jurisdictional calculus. *See Env't Rsch. Int'l*, 355 A.2d at 813. The breadth of such an exception, which would extend well beyond defendants "whose *sole* contact with the District consists of *dealing with a federal instrumentality*," would swallow the rule. *See id.* (emphases added). We therefore reject Browder's arguments in support of such a construction of the government contacts exception.

**C. Applying the District Long-Arm Statute and Jurisdictional Discovery**

Having determined the correct scope of the government contacts exception, we turn to whether Browder's nonexcluded conduct within the District after 2012 satisfies the District's long-arm statute. The parties agree that Browder committed an act outside the District that allegedly caused injury inside the District. Thus, whether there is personal jurisdiction under the statute depends on whether Browder's conduct satisfies one of the plus factors. *See* D.C. CODE § 13-423(a)(4); *Crane v. Carr*, 814 F.2d 758, 763 (D.C. Cir. 1987).

**1. The First and Third Plus Factors**

Akhmetshin asserts that sales of *Red Notice* in the District constitute, under the first plus factor, regularly doing business in the District and, under the third plus factor, deriving substantial revenue from the District. *See* Br. for Pl.-Appellant at 10-11. Akhmetshin also asserts that Browder's promotional events for the book in 2015 constituted, under the first plus factor, regularly soliciting business within the District. *See* Br. for Pl.-Appellant at 10-11. We disagree.

Preliminarily, there appears to be disagreement between the parties as to whether Browder's contacts related to *Red Notice* should be categorically excluded from the jurisdictional calculus because of the so-called "fiduciary shield." Under that doctrine, a defendant employee's "acts and contacts carried out solely in a corporate capacity" within a forum are removed from the jurisdictional analysis. *Flocco v. State Farm Mut. Auto. Ins. Co.*, 752 A.2d 147, 163 (D.C. 2000) (quoting *Wiggins v. Equifax Inc.*, 853 F. Supp. 500, 503 (D.D.C. 1994)). Akhmetshin argues that the doctrine cannot preclude consideration of Browder's *Red Notice*-related contacts with the District because Browder – as the founder and Chief Executive Officer of Hermitage – is more than a mere employee. *See* Br. for Pl.-Appellant at 11-13; Reply Br. for Pl.-Appellant at 11-13. Browder, for his part, asserts that "Akhmetshin's discussion of the fiduciary shield doctrine is . . . inapposite." Br. of Def.-Appellee at 25 (citation omitted).

Based on the current record, it is not clear to us that the fiduciary shield doctrine is relevant to this case. A panel of this court recently noted, in considering the applicability of the doctrine to another subsection of the District's long-arm statute, that "when District of Columbia courts discuss the fiduciary shield doctrine, they do so only in the context of construing what they perceive to be the outer limits of *the Due Process Clause*." *Urquhart-Bradley v. Mobley*, 964 F.3d 36, 47 (D.C. Cir. 2020) (emphasis added) (citations omitted). In this case, by contrast, at issue is whether Browder's contacts satisfy the District's *statutory* requirements for the exercise of long-arm jurisdiction. Moreover, the Court of Appeals has "explicitly decline[d] to adopt . . . an absolute 'fiduciary shield' doctrine," or "a *per se* rule that an employee's acts in his official capacity may *never* give rise to personal jurisdiction over him." *Flocco*, 752 A.2d at 163 n.20. And in this case,

Browder – as the author of *Red Notice* – was, at least in part, acting in an individual capacity when promoting the book in the District. *See Daley v. Alpha Kappa Alpha Sorority, Inc.*, 26 A.3d 723, 728 n.3 (D.C. 2011) (holding the fiduciary shield doctrine inapplicable to "individual . . . officers and directors" of an organization's governing body who "were also in part acting in their individual capacities as . . . members" of that body when undertaking conduct within the District). Thus, Browder's in-forum conduct related to *Red Notice* is not categorically excluded from the jurisdictional calculus under the fiduciary shield doctrine.

Nevertheless, even if such contacts are not subject to the fiduciary shield doctrine, they do not suffice to confer personal jurisdiction under the first or third plus factors. In *McFarlane v. Esquire Magazine*, which involved a magazine article, we explained that "[t]he writer is not the publisher; [the author]'s contacts must be assessed separately" for the purpose of establishing jurisdiction. 74 F.3d 1296, 1300 (D.C. Cir. 1996) (citation omitted). The same admonition applies here. Simon & Schuster, rather than Browder himself, makes the sales decisions for *Red Notice*, "including where to sell the book, how many copies each state or store receives, and how the book is advertised." Decl. of Ivan Cherkasov ¶ 4, J.A. 372. That the book is sold in the District does not, therefore, mean that Browder himself is regularly doing business here.

Similarly, Browder does not directly receive revenue from sales of *Red Notice* in the District. Such revenue goes to Simon & Schuster, as well as one of Hermitage's corporate entities. *See id.* at ¶ 6, J.A. 373. And the amount of revenue generated by sales of *Red Notice* in the District – per sealed documents Browder submitted to the District Court – is *de minimis* for a book that is, in Akhmetshin's own words, a "best-seller." *See* Compl. ¶ 68, J.A. 18; *see also* Br. for Pl.-Appellant at 6

(describing *Red Notice* as a "bestselling book"); Reply Br. for Pl.-Appellant at 4 (same). Accordingly, based on the current record, we cannot say that Browder derives substantial revenue from sales of the book in the District.

Akhmetshin also notes – and Browder does not contest – that, on at least three occasions in 2015, Browder appeared at events in the District to promote *Red Notice*. But such appearances, on their own, are not sufficient to establish that Browder was "*regularly*" soliciting business in the District under the first plus factor. *See* D.C. CODE § 13-423(a)(4) (emphasis added). As the Court of Appeals has explained, "'[t]he use of . . . 'regularly' to describe the type of contact contemplated indicates that . . . the minimal contacts with the District that are required should at least be continuing in character.'" *Parsons v. Mains*, 580 A.2d 1329, 1330 (D.C. 1990) (per curiam) (quoting *Sec. Bank, N. A. v. Tauber*, 347 F. Supp. 511, 515 (D.D.C. 1972)). Three appearances promoting a book over a span of months several years ago does not satisfy that requirement. *See id.* (holding that a "defendant's entry of an appearance as counsel in two or at most three matters over a . . . period of ten years or longer" in the District was insufficient to establish jurisdiction under section 13-423(a)(4)).

We therefore agree with the District Court's conclusion that – based on the current record – neither the first nor third plus factors are satisfied. *See Akhmetshin*, 407 F. Supp. 3d at 21-22.

## 2. The Second Plus Factor

We turn now to the second plus factor, which focuses on whether Browder has engaged in a "persistent course of conduct" in the District. This is not a particularly high bar, and it "denotes connections considerably less substantial than those

required to establish general, 'all purpose' jurisdiction on the basis of 'doing business' in the forum." *Steinberg v. Int'l Crim. Police Org.*, 672 F.2d 927, 931 (D.C. Cir. 1981). Such a requirement serves "to exclude cases in which th[e in-forum] impact is an isolated event and the defendant otherwise has no, or scant, affiliations with the forum." *Id.*

According to the Court of Appeals, two or three trips to the District over the course of a decade likely would not constitute a persistent course of conduct. *See Parsons*, 580 A.2d at 1330. However, trips to the District once or twice a month for a period of years – depending on a defendant's conduct during them – might well suffice. *See Etchebarne-Bourdin v. Radice*, 754 A.2d 322, 325 & n.5 (D.C. 2000) (noting that a trial court in the District concluded that entrance into the District "between one and two times a month" for business purposes over a period of several years constituted a persistent course of conduct). Based on the record before us, Browder's conduct within the District appears to fall somewhere between these two bounds. That record, however, is incomplete.

### 3. Jurisdictional Discovery

Trial courts generally have "broad discretion" in ordering or denying discovery. *See Jeffries v. Barr*, 965 F.3d 843, 855 (D.C. Cir. 2020) (quoting *In re Multi-Piece Rim Prods. Liab. Litig.*, 653 F.2d 671, 679 (D.C. Cir. 1981)). But a trial court "by definition abuses its discretion when it makes an error of law." *Koch v. Cox*, 489 F.3d 384, 388 (D.C. Cir. 2007) (quoting *In re: Sealed Case (Med. Records)*, 381 F.3d 1205, 1211 (D.C. Cir. 2004)). Thus, "the 'abuse-of-discretion standard includes review to determine that the discretion was not guided by erroneous legal conclusions.'" *Id.* (quoting *In re: Sealed Case (Med. Records)*, 381 F.3d at 1211).

As discussed above, the District Court based its discovery decision on an incorrect view of the applicable law. According to the court, jurisdictional discovery was not warranted because the government contacts exception would remove virtually all of Browder's personal appearances in the District from the jurisdictional calculus. *Akhmetshin*, 407 F. Supp. 3d at 28. That conclusion was premised on an overly broad view of the government contacts exception. Even excluding his direct contacts with the federal government and its instrumentalities, Browder has had significant contacts with the District.

"[Akhmetshin] has pointed to links [Browder] has [had] with the District sufficient at least to permit further inquiry regarding personal jurisdiction, so that the statutory . . . questions can be resolved on a fuller record." *See Crane*, 814 F.2d at 760 (citation omitted). It is not clear "whether jurisdictional discovery will assist [Akhmetshin] on this score, but [he] is entitled to pursue precisely focused discovery aimed at addressing" whether Browder has engaged in a persistent course of conduct within the District. *See GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1352 (D.C. Cir. 2000).

### III. CONCLUSION

For the reasons set forth above, we vacate the judgment of the District Court, reverse the court's refusal to allow jurisdictional discovery, and remand the matter to allow the District Court to supplement the existing record. We are ordering "jurisdictional discovery to permit development of the record on [Browder's] contacts with the District of Columbia." *Urquhart-Bradley*, 964 F.3d at 49. Following discovery, the District Court must determine whether Browder engaged in a persistent course of conduct sufficient to subject him to personal jurisdiction under the District's long-arm statute. If the District Court determines that Browder is subject to personal jurisdiction, the court may then consider Browder's motion to dismiss under Rule 12(b)(6) for failure to state a cause of action.

TATEL, *Circuit Judge*, dissenting: The Supreme Court recently warned federal courts against "[s]peculat[ing]" about "novel issues of state law peculiarly calling for the exercise of judgment by the state courts." *McKesson v. Doe*, 592 U.S. ___, ___, No. 19-1108, 2020 WL 6385692, at *2 (Nov. 2, 2020) (per curiam) (internal quotation marks omitted). Such speculation, the Court explained, "'is particularly gratuitous when the state courts stand willing to address questions of state law on certification.'" *Id.* (quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, 79 (1997)). That is the case here. Pursuant to D.C. Code section 11-723(a), our court may certify "questions to the D.C. Court of Appeals when 'District of Columbia law is genuinely uncertain' and the question is of 'extreme public importance.'" *Companhia Brasileira Carbureto de Calicio v. Applied Industrial Materials Corp.*, 640 F.3d 369, 373 (D.C. Cir. 2011) (quoting *Sturdza v. United Arab Emirates*, 281 F.3d 1287, 1303 (D.C. Cir. 2002), *certified question answered*, 11 A.3d 251 (D.C. 2011)), *certified question answered*, 35 A.3d 1127 (D.C. 2012). In my view, the questions here satisfy both requirements and should be certified to the D.C. Court of Appeals.

## I.

The government contacts exception traces its roots to a series of D.C. Circuit decisions issued prior to enactment of the District of Columbia Court Reform and Criminal Procedure Act of 1970. In *Mueller Brass Co. v. Alexander Milburn Co.*, our court held that keeping an agent in the District of Columbia "to maintain contact with the Government agencies in respect to reports, allocations and directives relating to materials for production" did not amount to "doing business" under the relevant long-arm statute. 152 F.2d 142, 144 (D.C. Cir. 1945); *see also Fandel v. Arabian American Oil Co.*, 345 F.2d 87, 88–89 (D.C. Cir. 1965) (excluding the government-related activities of a District of Columbia office from the jurisdictional analysis because they did not constitute "doing

business" under the long-arm statute); *Traher v. De Havilland Aircraft of Canada, Ltd.*, 294 F.2d 229, 230 (D.C. Cir. 1961) (per curiam) (concluding that service was properly quashed when the only contact with the District was the maintenance of a single agent "who serve[d] as a liaison or contact man with the United States Government"). We likened this to our decisions excluding out-of-town news gathering from the jurisdictional analysis. If having agents in the District for the purpose of news gathering qualified as jurisdictional contacts, we explained, "'it would bring in nearly every important newspaper in the nation, and many foreign publishing corporations.'" *Mueller Brass Co.*, 152 F.2d at 143 (quoting *Neely v. Philadelphia Inquirer Co.*, 62 F.2d 873, 875 (D.C. Cir. 1932)).

After the newly-created D.C. Court of Appeals assumed responsibility for interpreting D.C. law, that court reaffirmed the government contacts exception in *Environmental Research International, Inc. v. Lockwood Greene Engineers, Inc.*, 355 A.2d 808, 813 (D.C. 1976) (en banc). There, citing our pre-1970 decisions and sitting en banc, the court explained that "entry into the District of Columbia by nonresidents for the purpose of contacting federal governmental agencies [wa]s not a basis for the assertion of in personam jurisdiction." *Id.* The court grounded the exception "in the unique character of the District as the seat of national government and in the correlative need for unfettered access to federal departments and agencies for the entire national citizenry." *Id.* Allowing courts to assert personal jurisdiction when nonresidents' "sole contact with the District consist[ed] of dealing with a federal instrumentality," the court explained, not only would "pose a threat to free public participation in government, but also would threaten to convert the District of Columbia into a national judicial forum." *Id.* Accordingly, visits "to the District of Columbia to consult with officials of the EPA concerning

the possibility of a grant" did not amount to transacting business under the long-arm statute. *Id.*

The first question in this case is whether the government contacts exception is limited to those who seek to influence federal legislation and policy through direct contacts with government officials, such as by visiting them in their offices, or whether it extends to those who likewise seek to influence federal policy but through such tried and true methods as press conferences, talk show appearances, or "book promotional appearances, discussions and speeches at think tanks, and interviews in both print and audio-visual media." Majority Op. at 20; *see Akhmetshin v. Browder*, 407 F. Supp. 3d 11, 24–25 (D.D.C. 2019) (finding that Browder's "media interviews" either "concerned the Magnitsky Act" or were "intended to challenge any efforts to repeal" the Act (internal quotation marks omitted)). According to my colleagues, the D.C. Court of Appeals resolved this very issue in *Environmental Research*. In support, they emphasize certain words and phrases used by the Court of Appeals—"sole," "dealing with a federal instrumentality," "for the purpose of contacting federal governmental agencies"—as well as that when the court referred to "unfettered access," it specified "to federal departments and agencies." Majority Op. at 17–18. "Based on this controlling precedent," the court concludes, "only direct contacts with members, agents, or instrumentalities of the federal government may be excluded from the jurisdictional calculus." Majority Op. at 18.

I beg to differ. "[A] judicial decision resolves only the case before it," *Spanski Enterprises, Inc. v. Telewizja Polska, S.A.*, 883 F.3d 904, 911 (D.C. Cir. 2018), and the only question before the court in *Environmental Research* was whether direct contacts, i.e., "consultation" with government officials, should be excluded from the jurisdictional analysis. Efforts to

influence federal policy through media events were not involved, and nothing in the court's opinion—let alone the words my colleagues emphasize—even hints that the court meant to address such efforts, much less exclude them from the government contacts exception.

It is true, as the court points out, that "Browder has not identified any controlling authority postdating *Environmental Research International* that applies the government contacts exception to conduct not involving direct contact with members of the federal government or government agencies." Majority Op. at 18. But there is a very good reason for that. Post–*Environmental Research*, the D.C. Court of Appeals has heard not a single case where the party invoking the government contacts exception had, like Browder, traveled to Washington in an effort to influence federal legislation through media events. As in *Environmental Research*, every subsequent case involved direct contacts with government officials: "negotiat[ions] with the FDA," *Rose v. Silver*, 394 A.2d 1368, 1369 (D.C. 1978), *reh'g en banc denied*, 398 A.2d 787 (D.C. 1979); "patent applications before the United States Patent and Trademark Office," *Lex Tex Ltd., Inc. v. Skillman*, 579 A.2d 244, 245 (D.C. 1990); and "petition[s] [to] the U.S. International Trade Commission," *Companhia Brasileira Carbureto De Calcio v. Applied Industrial Materials Corp.*, 35 A.3d 1127, 1132 (D.C. 2012). The same is true of our post–*Environmental Research* cases. None involved media events. They instead involved direct contacts: "personal appearances" before the Department of the Interior, *Naartex Consulting Corp. v. Watt*, 722 F.2d 779, 787 (D.C. Cir. 1983) (internal quotation marks omitted); a "letter" to a government official, *United States v. Ferrara*, 54 F.3d 825, 831 (D.C. Cir. 1995); "petitions" to a federal agency and hiring "a District of Columbia law firm," *Bechtel & Cole v. Graceland Broadcasting Inc.*, 18 F.3d 953 (D.C. Cir. 1994)

(unpublished table decision); and "act[ing] in the District in connection with the[] registration of" a trademark, *Stabilisierungsfonds Fur Wein v. Kaiser Stuhl Wine Distributors Pty. Ltd.*, 647 F.2d 200, 205 n.11 (D.C. Cir. 1981). To be sure, "judicial opinions establish precedential principles that apply to materially similar factual scenarios arising in future cases." *Spanski Enterprises*, 883 F.3d at 911. But neither *Environmental Research* nor any later case, from either the D.C. Court of Appeals or our court, is "materially similar" to this case because none involved efforts to influence federal legislation through media events.

Contrary to the court, then, no "controlling precedent" resolves the question of whether the government contacts exception extends to those who travel to Washington to influence federal policy through media events. The issue, moreover, satisfies both of our requirements for certification. Because neither the D.C. Court of Appeals nor our court has ever squarely addressed the question, and because neither court has left a "'discernible path for [us] to follow,'" *Dial A Car, Inc. v. Transportation, Inc.*, 132 F.3d 743, 746 (D.C. Cir. 1998) (quoting *Tidler v. Eli Lilly & Co.*, 851 F.2d 418, 426 (D.C. Cir. 1988)), "the scope of the government contacts exception is genuinely uncertain," *Companhia Brasileira*, 640 F.3d at 373. And because those seeking to influence federal policy rely so heavily on contacting federal officials through the media— think MSNBC, Fox News, CNN, etcetera etcetera—the question is of "sufficient public importance." *Id.*

Of course, the D.C. Court of Appeals might well agree with my colleagues. But given the uncertainty of District law and the importance of this issue, that "choice [is] not ours to make." *Owens v. Republic of Sudan*, 864 F.3d 751, 811 (D.C. Cir. 2017), *certified question answered*, 194 A.3d 38 (D.C.

2018), *vacated and remanded on other grounds sub nom. Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020).

**II.**

I would also certify the second question in this case: whether a foreign citizen like Browder can invoke the government contacts exception. *See* Majority Op. at 16 (explaining that if the court were to reach this issue, "certification to the Court of Appeals likely would be appropriate").

Recall that in *Environmental Research*, the D.C. Court of Appeals grounded the government contacts exception in both First Amendment and due process principles. But in a later case, *Rose v. Silver*, a panel of that court "conclude[d] that the First Amendment provides the only principled basis for exempting a foreign defendant from suit in the District of Columbia." 394 A.2d at 1374. The full court subsequently denied rehearing en banc. *Rose v. Silver*, 398 A.2d 787. As our court observed in *Naartex Consulting Corp. v. Watt*, *Rose* "appeared to limit the 'government contacts' exception to activities implicating [F]irst [A]mendment rights." 722 F.2d at 786; *see also Companhia Brasileira*, 640 F.3d at 372 ("[A] subsequent decision of a D.C. Court of Appeals panel may have limited the government contacts exception to cases in which the contacts with the federal government were an exercise of First Amendment rights.").

Relying on *Rose* and citing our cases, Akhmetshin argues that the government contacts exception does not apply to Browder because he "has no First Amendment right to petition the United States government given that he voluntarily relinquished his U.S. citizenship." Appellant's Br. 23. In *Naartex*, however, we said only that *Rose* "appeared" to limit the exception, not that it actually did, and we did so because,

as with our court, a panel of the D.C. Court of Appeals has no authority to issue a decision that conflicts with an earlier decision, especially one issued by the en banc court. We explained:

> In denying rehearing *en banc* in the *Rose* case, the full court failed to explain or reconcile the apparent conflict with the *Environmental Research* opinion, one judge finding none, and two other judges calling for the explicit rejection of the panel opinion in *Rose*. Since that time, the court has failed to clarify any possible conflict. Inasmuch as the denial of rehearing is evidence that no irreconcilable tension exists between the *en banc* opinion and a subsequent panel opinion, and considering that a panel of the District of Columbia Court of Appeals is prohibited from issuing an opinion which conflicts materially with a prior decision of the full court as this may be done only by the court sitting *en banc*, if it were necessary to determine what law controls today in the District of Columbia, we would still be hesitant to conclude that the clear holding against governmental contacts as a basis for personal jurisdiction in *Environmental Research* no longer controls.
>
> Fortunately, if there is any tension between *Environmental Research* and *Rose*, we need not resolve it . . . .

*Naartex*, 722 F.2d at 786–87 (alteration omitted) (internal quotation marks omitted) (citations omitted). A later panel of the D.C. Court of Appeals noted much the same. *See Companhia Brasileira*, 35 A.3d at 1131 ("[S]ome of our decisions *may* have implicitly narrowed the scope of the government contacts doctrine by concluding that 'the First

Amendment provides the only principled basis' supporting it." (emphasis added) (quoting *Rose*, 394 A.2d at 1374)). Although, as Browder points out, our court has previously mentioned the government contacts exception in "reference" to non-citizens, *see* Majority Op. at 13–15 (discussing the two cases upon which Browder relies), neither our court nor the D.C. Court of Appeals has ever squarely addressed whether a citizen of another country may invoke the exception.

Given this, and given the unresolved tension between *Environmental Research* and *Rose*, District of Columbia law is "genuinely uncertain" as to whether a foreign citizen may invoke the government contacts exception, "a question of state law that is vital to a correct disposition of the case before" us. *Tidler*, 851 F.2d at 426. Indeed, we have previously certified a different question to the D.C. Court of Appeals due to the very uncertainty that *Rose* created. *See Companhia Brasileira*, 640 F.3d at 373.

The question is also of "extreme public importance." *Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 564 (D.C. Cir. 1993) (internal quotation marks omitted). For one thing, it implicates a potential conflict between two decisions of the D.C. Court of Appeals—a conflict only that court may resolve. *See M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971) ("[N]o division of this court will overrule a prior decision of this court . . . [.] [S]uch result can only be accomplished by this court en banc." (footnote omitted)). Moreover, just as Browder has spent years seeking passage and enforcement of the Magnitsky Act, individuals and corporations throughout the world seek to influence U.S. legislation and policy. *See Companhia Brasileira*, 640 F.3d at 373 (concluding that the question to be certified was "of sufficient public importance because its resolution could affect numerous individuals and corporations that petition the federal government"); *Nationwide Mutual*

*Insurance Co. v. Richardson*, 270 F.3d 948, 950 (D.C. Cir. 2001) (explaining that because the clause at issue "potentially affect[ed] the insurance coverage of most businesses in the District of Columbia," the question was "one of significant import to the public"), *certified question answered*, 826 A.2d 310 (D.C. 2003), *reh'g en banc granted, opinion vacated*, 832 A.2d 752 (D.C. 2003), *vacated pursuant to settlement*, 844 A.2d 344 (D.C. 2004). Lastly, the issue affects core First Amendment values because it is far from clear whether the right to petition the government extends to Browder as a non-citizen. *See, e.g.*, *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990) (explaining that the Constitution's use of the phrase "the people" in the First Amendment "suggests that 'the people' protected by" that amendment "refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community"); *DKT Memorial Fund Ltd. v. Agency for International Development*, 887 F.2d 275, 285 (D.C. Cir. 1989) (expressing skepticism that foreign alien organizations were "within the 'zone of interests to be protected or regulated by'" the First Amendment (quoting *Association of Data Processing Service Organizations v. Camp*, 397 U.S. 150, 153 (1970)).

## III.

It goes without saying that the pandemic ravaging our nation is having a profound impact on the issues in this case. Fewer individuals are traveling to Washington to visit members of Congress, much less to participate in media events. But we have a specific case before us—William Browder traveled to the District to meet with government officials and repeatedly returned to participate in a series of media events—and we must decide that case. In any event, someday the pandemic will end, and even though travel to Washington may never return to pre-pandemic levels, how the courts resolve the two issues in

this case could significantly affect one of this city's major businesses: lobbying.

Accordingly, I would certify the following two issues to the D.C. Court of Appeals:

1. Does the government contacts exception extend to efforts to influence federal legislation and policy through the media and, if so, what standard should courts apply to determine which kinds of activities, ranging from press conferences aimed at specific legislation to general public advocacy, are covered?

2. May a citizen of a foreign country who is not a resident alien invoke the government contacts exception?

As in all certifications to the D.C. Court of Appeals, that court would "exercise [its] prerogative to frame the basic issues as [it] see[s] fit for an informed decision." *Delahanty v. Hinckley*, 564 A.2d 758, 760 (D.C. 1989) (internal quotation marks omitted).